**Marion GRAY–HOPKINS**

v.

**PRINCE GEORGE'S COUNTY, Maryland, et al.**

No. CIV. A. DKC20001771.

United States District Court,
D. Maryland.

Sept. 24, 2001.

574

Walter L. Blair, Blair & Lee, P.C., Hyattsville, MD, Johnnie L. Cochran, Jr., Law Office, New York City, for Plaintiff.

Michael D. Berman, Office of the Attorney General, Baltimore, MD, William A. Snoddy, Crystal Dixon Mittelstaedt, Office of Law for Prince George's County, Sean D. Wallace, Office of the County Attorney, Upper Marlboro, MD, for Defendants.

*MEMORANDUM OPINION*

CHASANOW, District Judge.

Plaintiff, Marion Gray–Hopkins, filed an action presenting civil rights and state law claims against Prince George's County ("the County"), as well as Officers Brian Catlett, James Skyrm and Devin White [1], alleging that Defendants wrongfully caused the death of her son, Gary Hopkins. Presently pending are cross motions for summary judgment filed by Plaintiff and Defendants, the County, Brian Catlett and James Skyrm.[2] Additionally, Devin White filed a separate motion to dismiss, or, in the alternative, for summary judgment.[3] Defendants' motions for summary judgment shall be granted in part and denied in part while Plaintiff's motion shall be denied.

## I. Background

On November 26, 1999, Gary Hopkins attended a dance held at the West Lanham Fire Department. Officers Brian Catlett and Michael Marriot were providing security for the event. While both police officers were off-duty, they were wearing Prince George's County Police Department uniforms. The party ended at approximately 2 a.m. on November 27, 1999.

According to Defendants, the following version accurately recounts the facts. Around 2:20 a.m. a fight broke out in the parking lot and the officers made an unsuccessful attempt to disperse the resulting crowd. Officer Catlett called the dispatcher to send on-duty officers for assistance. Much of the fighting cen-

tered around two vehicles, a cream-colored Cutlass and a black, four-door Cadillac. Officer Marriot heard a person in the crowd state that an individual in the Cutlass had a gun. That information was radioed to other police officers who were in route. Officer Devin White heard this transmission as he approached the firehouse.

When Officer White arrived at the firehouse, he stopped his marked police vehicle in front of the driveway. Paper No. 61, Ex. 4, Depo. of Devin White, at 42, line 3. He then approached the Cutlass with his gun drawn, as he alleges the car was already stopped, and asked several times that the vehicle's occupants let him see their hands. *Id.* at 48–49. The driver raised his hands while the passenger in the front exited the vehicle, disappearing into the crowd. *Id.* at 62, lines 5–19. Gary Hopkins, sitting in the rear of the vehicle, reached out and grabbed Officer White's gun. *Id.* at 73, line 8. Officer White backed away, retaining control over the gun. *Id.* Mr. Hopkins, who Defendants allege was intoxicated, then got out of the car.

After Mr. Hopkins got out of the car, Officer White backed further away from the car and ordered Mr. Hopkins to "Stop. Let me see your hands." *Id.* at line 20. Mr. Hopkins put his hands up, then lunged at the officer and, with both hands, grabbed for Officer White's gun. *Id.* at 84–85. Mr. Hopkins and Officer White then engaged in a struggle for the weapon. *Id.*; Ex. 1, Aff. of Michael Marriot, ¶ 12; Ex.2, Aff. of Johnny Montgomery, ¶ 9; Ex.

---

1. The claims against Prince George's County Police Department were dismissed on August 10, 2000, because a suit against the police department is essentially a suit against the County, already named as a Defendant. Paper No. 11.

2. Plaintiff has also filed a motion to strike that will be denied for reasons discussed later.

3. As discovery has closed and neither side objects, this court shall convert Devin White's motion to dismiss into a motion for summary judgment. Defendants submit that this motion is merely a supplemental motion to the earlier filed motion for summary judgment on behalf of Officer Catlett and Officer Skyrm and the County.

3, Aff. of David Paul Bradshaw, ¶ 8. During the struggle, Officer White repeatedly yelled for Mr. Hopkins to "Get off, let go, let me see your hands." *Id.* at 86.

Defendants also point to the testimony of Dr. Fowler and Agent Smrz. Dr. Fowler, the pathologist who conducted the autopsy on Gary Hopkins, stated that a laceration on Mr. Hopkins' left index finger was caused by the sharp superior edge of the front sight of a Prince George's County Police Department-issued Beretta handgun. Paper No. 61, Ex. 6, at 2. Agent Smrz testified that, in her opinion, Gary Hopkins was the source of the DNA recovered from the sight of Devin White's handgun. Paper No. 61, Ex. 11, at E–33, lines 16–19. Officer White testified that, while struggling with Mr. Hopkins, he heard a gunshot, which apparently forced Mr. Hopkins to let go of the weapon. *Id.* at 88, lines 1–6. The parties do not dispute that Officer Catlett fired that shot.[4]

Plaintiff does, however, sharply contest Defendants' version of events and offers the following as the accurate retelling. The party finished at 2:30 a.m. and there was a scuffle. Mr. Hopkins played the role of the peacemaker, not a troublemaker, by suggesting that everyone should leave the site and travel to his mother's house. Ex. 9, Depo. of Tyrone Freeman at 13. Officer White stopped the car in which Mr. Hopkins rode. Several witnesses testified that Mr. Hopkins was in a neutral position with his hands raised and at no point threatened Officer White or grabbed his gun. Paper No. 62, Ex. 4, Aff. of Tamille Keith at ¶ 5; Ex. 9, Depo. of

Tyrone Freeman at 14–16; Ex. 11, Aff. of Demita Hart at ¶ 9. According to Mr. Freeman, Mr. Hopkins had his hands raised and was facing Officer White when Officer Catlett jumped back and took one shot. Depo. of Tyrone Freeman at 16. After being shot, Mr. Hopkins was transferred to Doctors Community Hospital in Lanham, Maryland, where he was eventually pronounced dead. As noted above, neither side disputes that Officer Catlett's single shot killed Mr. Hopkins.

The Amended Complaint, filed January 4, 2001, contains six counts against all defendants: 1) violation of Plaintiff's and Gary Hopkins' federal constitutional rights; 2) violation of Gary Hopkins' rights under the Maryland Declaration of Rights; 3) wrongful death; 4) survivorship; 5) negligence; and 6) assault and battery; and a seventh count alleging Prince George's County's negligence in hiring and training.

## II. Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.

---

**4.** Defendants refer to Officer Catlett's trial testimony from *State of Maryland v. Brian Catlett,* Crim. Trials No. 00–1391X, February 21, 2001, as evidence that he shot Mr. Hopkins because the decedent was struggling for Officer White's gun. Plaintiff has filed a motion to strike Defendants' Opposition to Plaintiff's Motion for Summary Judgment and Devin White's Reply to Plaintiff's Opposition to

his Motion for Summary Judgment, claiming that, because the trial transcripts were generated after discovery closed, the material should be stricken. Without determining what evidence will or will not be allowed at trial, the court will deny the motion to strike because consideration of the trial testimony does not alter the outcome.

*Anderson,* 477 U.S. at 250, 106 S.Ct. 2505; *see also Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987); *Morrison v. Nissan Motor Co.,* 601 F.2d 139, 141 (4th Cir.1979); *Stevens v. Howard D. Johnson Co.,* 181 F.2d 390, 394 (4th Cir.1950). The moving party bears the burden of showing that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Pulliam Inv. Co.,* 810 F.2d at 1282 (citing *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gill v. Rollins Protective Servs. Co.,* 773 F.2d 592, 595 (4th Cir.1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element ... necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505.

## III. Analysis

### A. § 1983 Constitutional Violations [5]

#### 1. Illegal Vehicle Stop

 "There is no question that the stopping of a vehicle and the detention of its occupants is a seizure within the meaning of the Fourth Amendment." *Wilkes v. State,* 364 Md. 554, 774 A.2d 420, 430 (2001) (citing *Whren v. United States,* 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)). To determine if there has been a violation of the Fourth Amendment due to unreasonable search or seizure, the Supreme Court has stated:

> The touchstone of our analysis under the Fourth Amendment is always "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Reasonableness, of course, depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

*Pennsylvania v. Mimms,* 434 U.S. 106, 108–9, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). An investigative stop which amounts to a seizure within the meaning of the Fourth Amendment must be "supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity," *Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). This means that the suspicion must be more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry,* 392 U.S. at 27, 88 S.Ct. 1868.

---

5. In her complaint, Plaintiff claims that the actions of Officers White, Catlett, and Skyrm against her son violated her rights pursuant to the Fourth, Fifth, and Fourteenth Amendments. This court disagrees. First, Plaintiff has no claim for violation of her rights under the Fourth Amendment because she has not alleged, nor can it truthfully be alleged, that any officer took any action against her personally. Second, the Fourth Circuit has declined to recognize substantive due process claims by relatives of deceased persons for the deprivation of love and support of a family member. *See Shaw v. Stroud,* 13 F.3d 791, 804–805 (4th Cir.1994); *Rucker v. Hartford County,* 946 F.2d 278, 283 (4th Cir.1991).

■ While Officer White contends that the car containing Mr. Hopkins was already stationary when he arrived, it is undisputed that he approached the car with his firearm drawn, and ordered the occupants to stay in the car and to show him their hands. Such an interference with their freedom constitutes a Fourth Amendment seizure and must be justified by articulable suspicion. Officer White testified that he responded to an emergency dispatch for a large fight at the fire station on Good Luck Road, ex. 13 at 17–18, and that, en route, he heard a broadcast that the "subjects were possibly '7–A', meaning with a gun." Ex. 13 at 23. He then heard another broadcast from Brian Catlett that the individuals in the cream-colored Cutlass were the ones "possibly 7–A with a gun." Tr. 38.

Plaintiff's attempt to dispute that testimony relies exclusively on an inaudible tape of radio communications that night. The proffered transcript reflects that major portions of the tape were not transcribed because they were inaudible. The absence of mention of the weapon from the audible portion is not probative. Accordingly, Officer White's testimony that he had information that occupants of the car in which Mr. Hopkins was sitting were possibly armed with a gun remains uncontradicted.[6] A citizen's report of a gun in a car leaving the scene of a fight supplies the reasonable, articulable suspicion needed for the stop.[7] *Cf. Anderson v. Russell,* 247 F.3d 125, 130 (4th Cir.2001). Accord-

ingly, Plaintiff's claims arising from Officer White's stop of the car fail and summary judgment will be granted in favor of Officer White.

## 2. Excessive Force

■ The Supreme Court has held that "all claims that law enforcement officials used excessive force—deadly or not—in the course of making an arrest, investigatory stop, or other 'seizure' of a free citizen, should be analyzed under the Fourth Amendment and its 'reasonableness' standard". *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Thus, Plaintiff's claim that Officer Catlett used excessive deadly force in the course of Officer White's alleged stop should be analyzed under the Fourth Amendment objective reasonableness standard rather than a substantive due process standard. *Id.* at 387, 109 S.Ct. 1865.

■ To ascertain the objective reasonableness of an officer's actions, the court must consider factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865; *see also Sigman v. Town Chapel,* 161 F.3d 782, 786–87 (4th Cir.1998). Moreover, "[a] police officer may use deadly force when the officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." *Elliott v.*

---

6. Plaintiff relies on this testimony in pursuing her state law claims based on "expert" conclusions that Officer White's actions in approaching a car whose occupants were thought to be armed were contrary to normal police practices.

7. Plaintiff disputes the factual underpinnings for the reason for the stop. She does not challenge the existence of reasonable suspicion if the police received a citizen tip that an

occupant of the Cutlass had a gun. Even if the citizen information is subject to the scrutiny of an anonymous tip as in *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254, (2000) (decided after the events in this case), Officer White would be entitled to qualified, good faith immunity. In the rapidly unfolding situation, he reasonably relied on the dispatch information to make the stop.

*Leavitt,* 99 F.3d 640, 642 (4th Cir.1996) (citing *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)).

■ Defendants claim that Officer Catlett perceived a threat of harm because Mr. Hopkins lunged at Officer White and grabbed for his gun. However, this key fact is disputed by Plaintiff's evidence to the contrary. The fact that Mr. Hopkins' DNA was found on the front sight of Officer White's handgun is not dispositive on the question of whether Mr. Hopkins resisted after exiting the vehicle, given the testimony that he lunged for the gun twice, once before getting completely out of the car. This is not a situation where there are only minor discrepancies in testimony or where the witnesses' vantage point is significantly worse that the officers'. Given this dispute, summary judgment for either party is inappropriate on the claims stemming from the alleged use of excessive force.

### 3. Supervisory Liability

■ To establish supervisory liability under § 1983, one must show: 1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to plaintiff's decedent; 2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and 3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by plaintiff's decedent. *Shaw v. Stroud,* 13

F.3d 791, 799 (4th Cir.1994) (emphasis in original).

■ Plaintiff cannot meet the first prong of the test. It is undisputed that Sergeant Skyrm was not present when Mr. Hopkins was shot. Thus, he could not have had any knowledge that Officer Catlett was engaged in any conduct that posed "a pervasive and unreasonable risk" of constitutional injury to Mr. Hopkins. Plaintiff fails to offer any evidence to the contrary. Accordingly, Sgt. Skyrm is entitled to summary judgment on all claims against him.[8]

### 4. Qualified Immunity [9]

■ Officer Catlett asserts that he should be granted qualified immunity because he believed that Mr. Hopkins' alleged struggle for the gun proved that all the officers in the vicinity were in danger. Under the qualified immunity doctrine, law enforcement officials are not liable under federal law for civil damages to the extent that their conduct does not contravene "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The officers are entitled to summary judgment on the ground of qualified immunity if they can establish that "reasonable officer[s] could have believed [that their actions were] lawful, in light of clearly established law and the information the ... officers possessed." *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The threshold question in the qualified immunity issue is: "[t]aken in the light most favorable to the party asserting the

---

**8.** Inasmuch as Plaintiff's claims arising from Officer White's stop of the car and its occupants are unsubstantiated, the supervisory liability claim against Sgt. Skyrm fails. It would fail on the merits, too, for the reasons stated concerning Officer Catlett.

**9.** Officer White's entitlement to qualified immunity was recognized in footnote 7, *supra.*

injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz,* ── U.S. ──, ──, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001).

In the instant case, the parties offer dramatically different accounts of the incident. The disputed material facts include whether Mr. Hopkins resisted police commands and struggled with Officer White for his gun or whether he stood still and raised his hands immediately before he was shot. If Plaintiff's version is accepted, a jury could reasonably find that Mr. Hopkins' death resulted from a violation of his Fourth Amendment rights, because a reasonable officer would know that the shooting of a surrendered suspect is unjustified and unlawful. Because of this factual dispute, Officer Catlett is not entitled to qualified immunity at this time. *See Vathekan v. Prince George's County,* 154 F.3d 173, 180 (4th Cir.1998) ("[S]ummary judgment on qualified immunity grounds is improper as long as there remains any material factual disputes regarding the actual conduct of · defendants.") (internal citations omitted).

### 5. § 1983 Claim Against Prince George's County

■■■■ To impose liability on a municipality under § 1983, Plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's [constitutional] injury." *Bd. of County Comm'rs of Bryan County, OK,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (quoting *Monell v. NYC Dep't. of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Municipal liability will not be found through the doctrine of respondeat superior; the municipality is not liable solely because it employed a tortfeasor. *See Monell,* 436 U.S. at 691, 98 S.Ct. 2018. Plaintiff must produce evidence to establish that the municipality supported a policy or custom which resulted in a constitutional deprivation.

■■■■ Policy can be a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690, 98 S.Ct. 2018. Custom generally refers to those municipal practices so widespread as to have the force of law "even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 691, 98 S.Ct. 2018.

■■■■ The standard to make out this type of claim is deliberate indifference, "a stringent standard of fault, requiring proof that a municipal· actor disregarded a known or obvious consequence of his action." *Bd. of County Comm'rs,* 520 U.S. at 410, 117 S.Ct. 1382. Plaintiff must show the municipality had "actual or constructive notice" that the particular practice or lack thereof would "result in the violation of the constitutional rights of their citizens." *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Generally, "[p]roof of a single incident of unconstitutional activity is not sufficient to· impose [municipal] liability." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion). Thus, the plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of County Comm'rs,* 520 U.S. at 404, 117 S.Ct. 1382.

■■■■ Plaintiff offers no evidence that the County regularly authorizes the use of deadly force in inappropriate situations. It is well established that a single incident involving non-policy makers such as patrol officers, cannot be the basis of municipal liability under § 1983. *City of Oklahoma City,* 471 U.S. at 831, 105 S.Ct.

2427. Here, Plaintiff relies on the absence of a policy to prevent or sanction wrongful police shootings. However, the absence of a policy cannot itself lead to municipal liability unless it amounts to a tacit authorization of unconstitutional conduct. Failure to train, for example, must be more than simply negligent to be actionable. As stated in *Wellington v. Daniels,* 717 F.2d 932, 935–6 (4th Cir.1983) (citations and footnotes omitted):

> It is true that an official policy can be inferred from a municipality's omissions as well as from its acts ... Nevertheless, such omissions are actionable only if they constitute "tacit authorization" of or "deliberate indifference" to constitutional injuries.

Accordingly, summary judgment in favor of Prince George's County is granted on Plaintiff's § 1983 claims.

## B. Maryland State Law Claims

### 1. Immunity

#### a. Public Official Immunity

 Public official immunity relieves a police officer of liability for his negligent acts. *DiPino v. Davis,* 354 Md. 18, 729 A.2d 354, 370 (1999). The tortious conduct must have occurred while the officer was performing discretionary, as opposed to ministerial acts in furtherance of his official duties and without malice. Md. Cts. and Jud. Proc. Art, § 5–321(b)(1); *James v. Prince George's County,* 288 Md. 315, 418 A.2d 1173 (1980), *superceded on other grounds, Prince George's County v. Fitzhugh,* 308 Md. 384, 519 A.2d 1285, 1287 (1987).

 Defendants' argument asserting this immunity parallels that made earlier and depends entirely on their view of the facts. As discussed earlier, however,

Plaintiff's version of the facts, if accepted, would justify a conclusion that Defendant Catlett shot and killed Mr. ·Hopkins with malice and without justification. Accordingly, Officer Catlett is not entitled to summary judgment on Plaintiff's state law constitutional and intentional tort claims. However, summary judgment must be granted on the count of negligence as to all officers, because this is precisely the type of claim public official immunity is meant to prevent.

#### b. Governmental Immunity

 Prince George's County claims governmental immunity from liability for the actions of the officers. However, local governments are subject to respondeat superior liability for intentional and constitutional torts committed by their employees. *DiPino,* 729 A.2d at 371–73. With regard to other tort actions, counties and municipalities can rely on the defense of governmental immunity only when they exercise a function categorized as "governmental" rather than "proprietary" or "corporate". *Town of Port Deposit v. Petetit,* 113 Md. App. 401, 688 A.2d 54, 63 (1997). Moreover, "Maryland counties act in a governmental fashion ... when they employ, supervise, pay, and discharge police officers." *Taylor v. Prince George's County,* 377 F.Supp. 1004, 1007 (D.Md.1974). Thus, Prince George's County is not entitled to summary judgment based on governmental immunity with respect to Plaintiff's claims of intentional torts and state constitutional violations involving Officer Catlett. However, summary judgment is granted in favor of Prince George's County as to the other tort claims regarding other officers as well as the claims for negligence and negligent hiring and training.[10]

---

10. Plaintiff alleges in count seven that Prince George's County's Police Department negligently trained and hired its police officers. Because this court found that the Police De-

### 2. Maryland Constitutional Claims

Plaintiff and Defendants agree that Articles 24 and 26 of the Maryland Declaration of Rights are to be construed in pari materia with the Equal Protection Clause of the Fourteenth Amendment and the Fourth Amendment. *Williams v. Prince George's Cty.*, 112 Md.App. 526, 685 A.2d 884, 895–896 (1996); *Branch v. McGeeney*, 123 Md. App. 330, 718 A.2d 631, 640–41 (1998) (excessive force claims are treated similarly under both the federal Fourth Amendment and Articles 24 and 26 of the Maryland Declaration of Rights). Thus, summary judgment is not warranted for either party for the reasons enumerated above as to the Fourth Amendment excessive force claims, but will be granted as to Officer White's stop.

### 3. Wrongful Death and Survivorship

 A party may maintain an action for wrongful death against a person whose "wrongful act causes the death of another." Md.Code Ann., Cts. & Jud. Proc. § 3–902(a) (1998). In a survival action, a personal representative of a decedent's estate may bring a "personal action which the decedent might have commenced or prosecuted ... against a tortfeasor for a wrong which resulted in the death of the decedent." *Beynon v. Montgomery Cablevision Ltd. P'ship*, 351 Md. 460, 718 A.2d 1161, 1168 (1998) (quoting Md.Code Ann., Est. & Trusts § 7–401(x)). Defendant claims that because Officer Catlett's actions were reasonable, summary judgment should be granted as to these claims. However, given the tremendous factual disparity between Plaintiff and Defendant's accounts, the court shall not grant summary judgment to either party on these counts.

### 4. Assault and Battery

 Defendant argues that Officer Catlett had probable cause to use force against Mr. Hopkins and thus, there can be no assault or battery found to have been perpetrated against Mr. Hopkins. Under Maryland law, "[a] battery occurs when one intends a harmful or offensive contact with another without that person's consent." *Nelson v. Carroll*, 355 Md. 593, 735 A.2d 1096, 1099 (1999). "A battery has been defined as a harmful or offensive contact with a person resulting from an act intended to cause the person such contact." *Saba v. Darling*, 320 Md. 45, 575 A.2d 1240, 1242 (1990). A police officer is entitled to use that amount of force necessary to effect a lawful stop or arrest. Given the disputed facts, however, summary judgment would not be appropriate on this claim for either party.

## IV. Conclusion

Defendants' motions for summary judgment are granted in part and denied in part. Plaintiff's motion for summary judgment is denied. A separate Order will be entered.

### ORDER

In accordance with the accompanying Memorandum Opinion, IT IS this _____ day of September, 2001, by the United States District Court for the District of Maryland, ORDERED that:

1. The motion of Defendants Catlett, Skyrm, and Prince George's County for summary judgment BE, and the same hereby IS, GRANTED in part and DENIED in part;

2. Plaintiff's motion for summary judgment BE, and the same hereby IS, DENIED;

partment and the County were one and the same, this count shall be considered as brought against the County. The court shall

grant summary judgment in favor of the County on count seven on governmental immunity grounds.

3. Plaintiff's motion to strike BE, and the same hereby IS, DENIED;

4. The motion of Defendant White to dismiss or in the alternative for summary judgment BE, and the same hereby IS, GRANTED;

5. Judgment BE, and the same hereby IS, ENTERED against Plaintiff and in favor of Defendants Skyrm and White on all counts;

6. Judgment BE, and the same hereby IS, ENTERED against Plaintiff and in favor of Defendant Catlett and Prince George's County on the claims for negligence (count 5) and negligent hiring and training (count 7);

7. A telephone scheduling conference will be held on Wednesday, October 24, 2001 at 9:00 a.m. Counsel for Plaintiff is directed to arrange and initiate the call to counsel for Defendants and the court; and

8. The Clerk is directed to transmit a copy of this Order and the accompanying Memorandum Opinion to counsel for the parties.